**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**FORT LAUDERDALE DIVISION**

**CASE NO.: 19-mj-06135-PMH-1**

UNITED STATES OF AMERICA, )
)
Plaintiff, ) April 2, 2019
)
v. )
) Pages 1 - 46
JEROME WATSON, )
)
Defendant. )
_______________________________/

DETENTION AND REMOVAL PROCEEDINGS

BEFORE THE HONORABLE PATRICK M. HUNT
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

On behalf of the Plaintiff:

UNITED STATES ATTORNEY'S OFFICE
500 East Broward Boulevard
7th Floor,
Fort Lauderdale, FL 33394
BY: DONALD F. CHASE, II, AUSA

APPEARANCES CONTINUED:

On behalf of Defendant Jerome Watson:

FEDERAL PUBLIC DEFENDER'S OFFICE
One East Broward Boulevard,
Suite 1100,
Fort Lauderdale, FL 33301
BY: HUDA A. MACRI, AFPD

Transcribed By:

BONNIE JOY LEWIS, R.P.R.
7001 SW 13 Street
Pembroke Pines, FL 33023
954-985-8875
caselawrptg@gmail.com

I N D E X

THE WITNESS: PAGE:

**FBI TFO BRIAN MARTIN**

Cross Examination by Ms. Macri: 16
Redirect Examination by Mr. Chase: --

(Thereupon, the following proceedings were held:)

THE COURTROOM DEPUTY: United States of America versus Jerome Watson.

Would counsel please announce their appearances for the record.

MR. CHASE: Good morning, Your Honor.

Don Chase, assistant United States attorney on behalf of the United States of America.

THE COURT: Good morning.

MS. MACRI: Good morning, Your Honor.

Huda Ajlani Macri representing Mr. Watson who is sitting here to my right.

THE COURT: Okay. Good morning.

We're here for pretrial detention and removal. Do we have any agreements or are we going forward?

MR. CHASE: Going forward, Your Honor.

THE COURT: Both sides ready?

MR. CHASE: Yes, sir.

MS. MACRI: Yes.

THE COURT: All right. Mr. Chase, as you know, you may proceed by proffer as long as there's a knowledgeable agent available for cross-examination with respect to pretrial detention.

If you all as part of your proffer, if you proceed by proffer let me know what the basis of the request, whether

there is a presumption. And also if you know how much time Mr. Watson would be looking at if he were convicted, the guideline.

MR. CHASE: Judge, the Government is seeking pretrial detention based on both grounds, danger to the community as well as risk of flight.

Judge, as you know from the looking at the docket sheet, there was criminal complaint filed in the Eastern District of Michigan, which is Detroit charging the Defendant with bank fraud, aggravated identity theft, and attempting conspiracy due to same.

Judge, this comes from an investigation regarding the Felony Lane Gang. This is a term that's been developed based upon the fact that there are car burglaries, women's purses, and men's identifications are stolen and then used to tender checks that have been stolen in other car burglaries or in that car burglary.

The Felony Lane Gang tag comes from the fact that normally the stolen document is tendered at the lane at the drive-thru of the bank furthest away so that hopefully they are not detected then and, in fact, the person tendering the check is not the holder of the check.

Judge, the evidence will show that this Defendant and others that would commit car burglaries and steal purses that have been left inside of the passenger compartment.

Female conspirators would then be found impersonating

the appearance of the victim by similar facial and physical characteristics with the help of makeup and wigs.

Checks stolen during these car burglaries would be tendered at drive-thrus of the victim banks as a second vehicle was present to conduct surveillance for police activity.

Rental cars were often rented by friends of group members and they were used so that they would not be associated with the criminal activities of which these cars were being used to commit.

Additionally, the rental cars were often tagged with stolen license plates to prevent further identification of the participants if, in fact, a witness saw the car involved in the crime or surveillance cameras were able to obtain a photograph of the tag.

Members of this conspiracy, Judge, have been instructed to flee from the police and start a high speed chase under the belief that the police would not endanger other drivers by participating in a high speed chase involving bank fraud.

In fact, Judge, one high speed chase did, in fact, cause a car accident in the Detroit area that I will elaborate upon later.

Judge, as I mentioned, the criminal complaint charges two incidents. In fact, Judge, between June 7th of 2015 and June 29th of 2015, this Defendant and seven co-defendants

committed 29 bank frauds in that 22-day timeframe. And used the materials stolen during car burglaries with the amount of loss estimated to be approximately $44,355. The criminal complaint only charged two of the crimes committed during this 22-day crime spree.

Judge, of the crimes set forth in the criminal complaint, one of them occurred on June 23rd of 2015 in Chesterfield Township, which is a Detroit suburb.

A female victim witnessed men breaking into her car. When she approached they quickly fled in a SUV. The victim called 911. Shortly thereafter, another 911 call reported a rollover accident involving a similar SUV that struck another vehicle with three men fleeing from the SUV.

This Defendant, Mr. Watson, and a co-Defendant were pursued on foot and were eventually apprehended. The third man was not found.

Judge, as part of our basis for the risk of flight, the Defendant gave law enforcement two false names upon his arrest, Kendrick Dickson and Jerrod; J-E-R-R-O-D Watson, the Defendant's brother and he was only subsequently identified through a fingerprint match.

On the ground, Judge, was evidence of destruction of evidence. Before fleeing, the wrecked SUV, pieces of checks had been destroyed, teared them into pieces and these checks were able to be traced to victims of other car burglaries.

Two of the cellular telephone were Apple iPhones that were not able to be searched back on June 23rd of 2015 until technological advances became available.

Those technological advances, Judge -- and this explains the reason for delay in the issuance of the criminal complaint of the Government's request for no bond -- the search warrant was executed on May 16 of 2018 after technological advances allowed the several of the Apple phone.

One of two phones belongs to Mr. Watson. There were photographs in this cellular telephone of drivers licenses stolen during car burglaries.

Additionally, Judge, location information of text messages show the Defendant was in the vicinity of numerous car burglaries and bank frauds, similar of which occurred during the 22-day crime spree of 29 bank frauds between June 7th of 2015 and June 29th of 2015.

From the search of this cellular telephone and the location information found, Judge, it was learned that on June 17th of 2015, which is the other crimes set forth, co-Defendant Wendy Kroner; K-R-O-N-E-R, posing as a victim of car burglary had been committed with the help of Mr. Watson and others.

She did commit bank fraud and identity theft at the Bank of America located in Troy Michigan by cashing two checks in the amount of $2,350 and $2,275.

Judge, the Detroit AUSA is seeking pretrial deposition

based upon both grounds.

As mentioned, Judge, part of the reason for the risk of flight is the two names, Kendrick Dickson and Jerrod Watson provided by this Defendant upon his arrest on June 23rd of 2015.

Judge, risk of flight can really be tantamount, Judge, to the risk of failure to appear because this Defendant also failed to appear to respond to June 23rd of 2015 Chesterfield Township charges of larceny.

THE COURT: Pretrial Services Report shows that it was dismissed. So I don't see a failure to appear.

MR. CHASE: It's on the NCIC, Judge.

Judge, six days after being released on state bond on June 23rd of 2015, from that Chesterfield Township larceny offense, the Defendant committed more of these types of crimes on June 29th of 2015.

On June 29th of 2015, again, the co-Defendant Wendy Kroner, who was involved in the June 17th of 2015 bank fraud and identity theft, posed again as a victim of car burglary. Committed with the help of Watson and others bank fraud was committed and identity theft at the Community of Federal Credit Union in Canton, Michigan by cashing two checks in the amount of $1,000 and $975.

Judge, the criminal complaint and arrest warrant were issued in the Eastern District of Michigan on July 6th of 2018.

The Defendant has known about the warrant for his arrest since approximately November 20th of 2018. On November 20th of 2018 the FBI visited his last known address to execute the arrest warrant. The residence at this address, including the Defendant's 18-year-old son Jerome, said the Defendant did not live at the address. They did not know the Defendant's cellular phone number and the whereabouts of the Defendant was unknown.

The Defendant was arrested on March 22 of 2019 at a function for his son Jerome. The address provided by the Defendant, upon his arrest of law enforcement, was the house visited by the FBI on November 20th of 2018.

Judge, the identification of this Defendant has been established by the following means. The June 23rd of 2015 Chesterfield PD arrest fingerprints where the Defendant gave two false names, that being Kendrick Dickson and Jerrod Watson did, in fact, come back to this Defendant Jerome Watson.

Fergardo U.S. Marshal Service, when booking the Defendant, ran his fingerprints and a match was made, in fact, to the June 23rd of 2015 Chesterfield PD arrest of this Defendant.

The booking photograph of the June 23rd of 2015 Chesterfield PD photograph, compared with the booking photograph taken at the Broward County Jail, appears to be the same person. And finally, dates of birth match, January 5th of

1981.

Judge, regarding danger to the community, this Defendant has an extensive criminal history, adult as well as minor. He has six adult felony convictions. The convictions are from 2003 robbery strong arm and battery on a pregnant female. He received five years and four months and one day in jail;

From 2005 dealing in stolen property, 180 days in jail, three years probation;

June of 2006, dealing in stolen property, one month in jail, three years probation, and one criminal history category point. The first two, because of their age, has no criminal history category points;

January 20th of 2009, criminal mischief, 18 months probation, one history category point;

A similar offense on September 29th of 2014, financial identity theft in Illinois, 30 months of jail, three criminal history category points.

In fact, Judge, he was on probation for this offense when he committed the offenses in Detroit.

Again, Judge, if you can't abide by the conditions of probation, then, you are not going to be able to abide by conditions of bond.

Regarding the misdemeanor adult convictions there are four. A couple are a basis, again, for the no-bond request.

The first is possession of marijuana back in February of 2009, six months probation, one point;

June of 2009, Judge, false identification to law enforcement. Similar to what happened upon his arrest on June 23rd of 2015 in the Detroit area. That case was resolved by court costs, one point;

June of 2011, resisting arrest without violence, ten days in jail, one point. And again, Judge, another conviction for false identification to law enforcement. Again, very similar to what happened on June 23rd of 2015 in the Detroit area;

In February of 2012, he was convicted for that offense, court costs and one point.

Judge, the tabulation showed nine criminal history category points. It would be more, except for the age of the robbery strong arm, battery on a pregnant female, and dealing in stolen property from 2003 and 2005. He would be, in fact, a criminal category six if those scored.

He's nine. You take away two points, Judge, because six of them are one-pointers. So his total is seven. You add two for the fact that he committed these crimes while under supervision for the financial identity crimes conviction on September 29th of 2014 in the Illinois's case. So he has a total criminal history category of nine. Nine for criminal history category of four.

Judge, there are three violations of probation arrests shown on his NCIC. One of them was, in fact, adjudicated. There are violations of probation on August of 2005, June of 2006, June of 2008.

The NCIC shows the August of 2005 was related to dealing in stolen property and there was an amended judgment entered on June 22 of 2006 of one month in jail and three years probation.

And Judge, there is a failure to appear on 12/31/08 where that case, Judge, was resolved by adjudicated guilty and court costs.

Judge, he also has convictions as a minor. He has five; strong armed robbery, aggravated battery, burglary occupied conveyance, escape, aggravated battery and misdemeanor conviction for trespassing.

Judge, he has been a hardened criminal since the age of 15. His first conviction was strong arm robbery and he is still doing convictions up until at least the criminal complaint filed in Detroit regarding crimes in June of 2015.

Judge, the guidelines computations, the bank fraud offense has as statutory maximum of five 30 years. There are 29 bank fraud offenses that could be charged.

The aggravated theft is a two-year consecutive count. There are 29 potential aggravated identity theft charges that can be charged. That would be 58 years, if my math is right

based upon my Georgia public school education. I don't have enough fingers to verify, but that alone would be 58 years, more than likely, a death sentence for this Defendant.

The computation, Judge, is bank fraud starts at seven. The amount of the loss is between $40,000 and $95,000 for a six-level increase. There are more than ten victim. So you have a score, thus far, of 15. You have obstruction of justice of two for an adjusted base offense level of 17.

THE COURT: What is the basis for the obstruction of justice?

MR. CHASE: That would be the wrecking the car and fleeing from the police and giving the false name, two false names at the time of arrest. That's just off the top of my head.

THE COURT: Do you know who was driving?

MR. CHASE: He was apparently not driving, but there is some dispute as to whether he was in the front seat or back seat, but he did run and he was found in an adjacent residential back yard that he subsequently gave two false names.

THE COURT: Okay.

MR. CHASE: Then he failed to appear for that court.

Judge, if he is convicted at trial, the adjusted base offense level is 17 and criminal category of four based on nine points is 37 to 46 on the bank frauds and you would get at

least 24 months he was convicted of one or more of the aggravated identity theft charges. Apparently that can be run concurrently or consecutively. So that would be a 61 to 70-month range.

After a guilty plea and acceptance of responsibility, three levels. His adjusted base offense would be 14 and that would set the range for a criminal history four at 27 to 33. Add 24 months at least for one aggravated identity theft charge up to 29 and the range would be 51 to 57.

THE COURT: Does that conclude the proffer?

MR. CHASE: Yes, sir.

THE COURT: All right. Thank you.

Miss Macri, did you want to cross-examine the agent?

MS. MACRI: Yes, sir.

THE COURT: Come on up.

MR. CHASE: Judge, this is Task Force Officer Brian Martin, Your Honor.

THE COURTROOM DEPUTY: Right here, sir.

THE WITNESS: Yes, sir.

THE COURTROOM DEPUTY: Raise your right hand, please.

THE WITNESS: (Complied.)

(Witness sworn.)

THE COURTROOM DEPUTY: You can lower your hand, sir. Please be seated.

State your name and spell your last name for the

record and let us know what agency you work for.

THE WITNESS: Brian Martin; M-A-R-T-I-N. I'm with the Federal Bureau of Investigation.

THE COURT: All right. Agent Martin, did you hear the proffer?

THE WITNESS: Yes, sir, I did.

THE COURT: Was it accurate?

THE WITNESS: Yes, sir.

THE COURT: Anything else you would like to add, change, correct?

THE WITNESS: No, sir.

THE COURT: Are you prepared to adopt it as your own testimony?

THE WITNESS: Yes, sir.

THE COURT: All right. You may proceed.

TFO BRIAN MARTIN, GOVERNMENT'S WITNESS SWORN

CROSS EXAMINATION

BY MS. MACRI:

Q. Agent Martin, are you the lead agent on the case?

A. **Co-lead agent.**

Q. Co-lead agent.

And were you involved with the investigation in 2015 on the state case?

A. **Only as it pertains to the federal case.**

Q. When did the federal case investigation start?

A. **The investigation of this Felony Lane Gang began back in about 2013.**
Q. This incident that we're talking about here, this 2015 incident, it was first charged in state court; is that correct?
A. **That's correct.**
Q. And it went on for two years before disposition of the case; is that right?
A. **Yes, I believe it was about two years.**
Q. During that two years was the FBI investigating this case?
A. **Yes.**
Q. Okay. And during that time, Mr. Watson was out on bond for this state case; is that correct?
A. **Yes.**
Q. And he was traveling --
A. **He did not --**
Q. Sorry. I'm sorry. I didn't hear you.
A. **He did not appear back in Michigan for the state case.**
Q. He didn't fly back and forth from here to Michigan?
A. **Not for the state case, no.**
Q. And the state case that I'm talking about was in McComb County, Michigan, correct?
A. **Correct. Chesterfield Township.**
Q. Chesterfield Township.
Okay. And that was the case that was dismissed at trial on February 22nd of 2017?

A. **I don't believe it was dismissed at trial.**

**The prosecutor told me that they were dismissing the case because they were higher federal charges. So they dismissed the state case in lieu of federal charges.**

Q. Okay. And are you aware that Mr. Watson actually physically appeared in Michigan four or five times for the hearings?

A. **I am not.**

Q. Were you at each of these hearings that were taking place in Michigan in the state court case?

A. **No, that was the state court case.**

Q. Okay. So you are not aware of whether he was actually there or not?

A. **I'm relying on the information from the prosecutor, which was that he was not.**

Q. Okay. And these incidents all happened in 2015?

A. **That are charged in the federal complaint, yes.**

Q. And were you able to get a warrant in -- the first warrant you had was in 2015 for the unlocking of the iPhones; is that correct?

A. **No, that was 2018 we were able to get that warrant.**

Q. The initial warrant that was issued, though, was in 2015; July of 2015; is that right? And then you got more advanced in technology?

A. **Correct.**

Q. And that's in 2017 where you got more information?
A. **2018 where we got more information, yes.**
Q. Okay. And during that entire time, Mr. Watson was not in custody?
A. **Not that I am aware of, no.**
Q. He was down here in Fort Lauderdale; is that correct?
A. **I'm not sure where he was at, at that time. We didn't have him in custody.**
Q. Okay. And then, you said, like you said, in May of 2018 is where you got more information from the iPhones?
A. **Yes. We were able to collect information after Quantico was able to open them.**
Q. And you were able to get -- or the complaint was signed by a U.S. Magistrate Judge on July 6th of 2018; is that correct?
A. **If that's the date that's on the complaint, yes, ma'am.**
Q. And that was over a year ago?
A. **Yes, ma'am.**
Q. All right. And during that time, Mr. Watson was not in state custody or federal custody, correct? He was out in the public?
A. **I believe so, yes.**
Q. All right. And from you know and from what the prosecutor told you during that time, he wasn't arrested for anything else?
A. **As far as I am aware, yes, ma'am.**

Q. Okay. And you, as a FBI agent, do you have access to IRS records if you wanted to look at somebody's IRS records, tax records?
A. **I'm a task force officer, but no, IRS does not share those records with us.**
Q. All right. Do you have an ability to find if somebody is employed and where they are employed at? Do you have any type of database that you have access to?
A. **We have certain databases. How good they are is debatable.**
Q. Okay. But you're the FBI, correct?
A. **Well, yes.**
Q. Okay. And you have all of --
A. **Not everybody shares their information with us, however.**
Q. And were you involved in the arrest of Mr. Watson?
A. **No.**
Q. Okay. Are you aware of where he was arrested?
A. **Yes.**
Q. And where was that?
A. **Davie, Florida.**
Q. And was that at a skating rink at a birthday party for his son?
A. **It was a fundraiser for a football team.**
Q. Okay. And do you know which son it was? It wasn't the 18-year-old that you initially had contact with; is that correct?

A. **I believe it was for a younger son.**

Q. All right. And are you aware that his -- or do you know anything about the co-Defendant in the case, D'Anthony Ferguson?

A. **Yes.**

Q. And Mr. Ferguson is out on bond right now?

A. **I'm not sure if he's -- I haven't been following that case. Once it gets to court, we move on to other suspects and other cases. So whether or not he is out on bond, I am not sure.**

Q. Do you know if he was out on bond from the beginning of the case when it started here in the Southern District of Florida where he was arrested?

A. **I believe he was given a bond, yes.**

Q. Okay. And he has appeared in court and he is now awaiting sentencing?

A. **The status of his case I'm not sure, but I believe he has appeared in court.**

Q. Okay.

MS. MACRI: Your Honor, may I have one moment, please?

THE COURT: Yes.

MS. MACRI: I have nothing further. Thank you.

THE COURT: Thank you, ma'am.

Any redirect?

MR. CHASE: No, sir.

THE COURT: Agent, let me ask you if you can clarify

for me.

Again, my Pretrial Services Report shows that in 2015, it doesn't show any failure to appear and it shows that the case was dismissed.

I assume Miss Macri has a good faith basis for asking her question regarding him appearing multiple times at those hearings in Detroit or in Chesterfield. Mr. Chase, though, has proffered that he failed to appear.

Can you clarify whether he ever appeared on the state cases, whether he ever failed to appear, whether any warrant was ever issued based on him not appearing?

THE WITNESS: When he was arrested he gave his brother's name Jerrod Watson.

THE COURT: Okay.

THE WITNESS: Chesterfield Township believed that he was Jerrod Watson until I was able to get his fingerprints from his arrest and confirm those with Michigan State Police with a similar set of prints that were taken from him earlier in his criminal history. And that's when it was confirmed that he was Jerome Watson and not Jerrod Watson.

So if he had appeared in court on the Chesterfield Township case, he was continuing to give his brother's name instead of his own. Once they found that he was actually Jerome Watson and we had a federal case against him for these activities, they stated that due to -- they didn't want to

spend money on a state case knowing that he was facing higher charges in a federal case. So that's why they had dismissed that case. Not because they didn't have a good case, but because it didn't make sense to charge him --

THE COURT: Sure.

THE WITNESS: -- and put him in jail for a smaller amount of time when we were going after him for larger charges.

THE COURT: All right. I get that, but even if he was appearing under a different name, did he physically appear at all of his appearances in that case?

THE WITNESS: From the information I had from the prosecutor, the prosecutor stated that nobody had appeared on that case.

THE COURT: Okay. Can we resolve this?

MS. MACRI: Your Honor, I do have on my phone -- unfortunately, I was unable to print it out, the McComb County minutes from court and there was no failure to appear. And there was at least five or six times that Mr. Watson had to appear in court.

It is under Jerrod Watson, but he physically appeared five or six times. And I also have proffered testimony in that regard from Mr. Watson's employer who knew about the case that was pending.

THE COURT: Mr. Chase, you said it's on the NCIC or Pretrial is it on the NCIC that he failed to appear on that

case?

MR. CHASE: No, sir. I got the information from the prosecutor and the DA agent.

THE COURT: Is it possible that what the prosecutor is saying is he didn't appear because he didn't appear under his own name, but the body was there every time?

MR. CHASE: No, Judge. I don't think a prosecutor would make that distinction.

THE COURT: All right. What about did you have anything to do with the attempt to locate Mr. Watson in November?

THE WITNESS: We sent the request from the Detroit office to the Miami office to have him arrested on the case.

And so it was Miami agents that went out to the house and also Miami agents that arrested Mr. Ferguson originally. So we didn't come down to do that. We relied on the Miami office to do that.

THE COURT: All right. Mr. Chase proffered that someone went to the house and spoke to his 18-year-old son and left a message, but there was never any contact with him?

THE WITNESS: That is correct.

THE COURT: Do you know anything else about that?

THE WITNESS: Just that they had spoken to family members. They were told we don't know where he's at. We don't have any contact information from him. And then, subsequently

when he was arrested this month, he gave the same address that the agents went to back in November as his address.

THE COURT: All right. Anyone have any followup based on those questions?

MR. CHASE: No, sir.

THE COURT: Okay. Thank you. You may step down.

THE WITNESS: Thank you, sir.

THE COURT: Any additional testimony or evidence from the Government?

MR. CHASE: No, Your Honor.

THE COURT: All right. Any evidence or testimony from you, Miss Macri, including letting me know whether the Pretrial Services Report is accurate?

MS. MACRI: Judge, I do believe that the Pretrial Services Report is accurate.

I do have a witness. However, he could not physically be here. I could proffer what he would say. I do have his phone number. He is disabled and wasn't able to appear.

He's Mr. Watson's employer and has been for the past three years. And he says that if you released him at 12:00 he would be back to work at 2:00. That he thinks that Mr. Watson has moved on with his life and he is doing really well.

That he makes $15.50 an hour. He works Monday through Fridays, sometimes Saturdays and Sundays. That customers love him. He knew about his case from Michigan in 2015 and he flew

back and forth to Michigan several times and Mr. Polina (phonetic) can attest to that.

He is a businessowner. He has lived in South Florida for the past 30 years. He said that he would be more than happy for Probation to go and verify all this information with him.

Mr. Watson is also in plumbing school as an apprenticeship in his third year and Mr. Polina also would be able to testify that he is doing this. He only has one semester left and he has been working.

If the FBI wanted to look for him and find out where he was, they could have just ran his records for work. He has been gainfully employed for the past three or four years.

His fiancee is present and his father-in-law are also present. He has --

THE COURT: All right. Before you get to that, what's the explanation -- you said that the said the FBI could have gone to look for him. They did go to look for him and they went to the house apparently where he was living and --

MS. MACRI: So that house, that address is on his driver's license and it is his mailing address. Once he lives with his fiancee, Kendra Ashley.

The home that -- Your Honor, I believe you were the one that presided over the initial when you were appointing the Federal Public Defender's Office, his mom was here and she

spoke about a house that is to be inherited. And that is the address that he uses for everything as his permanent address.

THE COURT: The 2411 Utopia Drive, that's the house where he is lives with his fiancee, but the house that's listed on his driver's license is his mom's house that he would inherent. And as far as you know that's the house that --

MS. MACRI: They went to, as far as I understand.

THE COURT: All right.

MS. MACRI: I did pull all the records from a McComb County. There were no warrants. There were never any warrants issued. There were no failures to appear. I didn't see any failures to appear also in the PSI.

THE COURT: Well, there's at least one, but not in the case.

MS. MACRI: Right, it was a misdemeanor traffic offense here in Fort Lauderdale, I think.

MR. CHASE: False identification.

MS. MACRI: The false I.D.

MR. CHASE: Again.

MS. MACRI: Your Honor, the co-Defendant is also out on bond and has been on bond from the pendency of this case. This case is four years old at this point.

The agent said that the state did not want to spend any money, but they spent two years of money prosecuting this case. And it was dismissed from even the minutes during trial

or the time that it was set for trial. So, at that point, if a case is set for trial, the money has already been spent. So I believe it's the same exact conduct. The state wasn't able to prove it. So the Feds picked it up.

THE COURT: Right. And the Feds picked it up, but have access to more evidence so --

MS. MACRI: Right.

THE COURT: (Inaudible.)

MS. MACRI: Right.

THE COURT: The co-Defendant is awaiting sentencing or is --

MS. MACRI: He's awaiting sentencing.

From the information I received, I have just a copy of his bond paperwork. I could have my assistant check and see if he is set for sentencing.

THE COURT: It's not vital.

Would you do an additional proffer about -- is there anybody here who could co-sign who has any property?

MS. MACRI: Yes. Mom, his wife who -- Kendra Ashley who is actually a 911 operator who has a stable job.

Mom is here, the grandmother, and Willie Ashley, who is his father-in-law and who is the one who helped him secure the job at the air conditioning, Total Appliance and Air Conditioning.

THE COURT: And in the Pretrial Services Report, Miss

Ashley is listed as a fiancee. Are they married?

MS. MACRI: Yes.

THE COURT: She's his wife.

MS. MACRI: She's his fiancee, Kendra Ashley.

THE COURT: Does he have a wife and a fiancee?

MS. MACRI: That's my wife, but that's my wife, but that's really my fiancee.

THE COURT: So tell me who, if he were released, where would he live and who could co-sign on the bond and is there a property?

MS. MACRI: He would live at 2411 Utopia Drive in Miramar, Florida with Kendra Ashley.

I believe there is a property because there is a home that they have spoken of, mom's home. I haven't -- yes, I am getting head nods, yes. Grandma is here. I'm not sure what her situation -- Grandma, do you have property?

GRANDMOTHER: Yes.

MS. MACRI: I think there are enough assets for the Court to be comfortable giving him a bond.

THE COURT: Tell me what they are.

MS. MACRI: The home that the FBI actually went to is valued at $125,000.

I think mom's testimony was last week and what Pretrial Services has listed in here, he has a couple of vehicles that are worth money. However, he owes money on

those. He has a stable job and employment. If you give me one moment, I could find out if grandma has a home.

THE COURT: I think the mom said that the house is free and clear; is that right?

MS. MACRI: Yes. It is free and clear and worth about $125,000.

THE COURT: And she was here the other day and is she willing to co-sign?

MS. MACRI: Yes.

THE COURT: Okay. And can you find out if his grandmother has any?

MS. MACRI: Your Honor, Mr. Willie Ashley, the father-in-law or soon to be father-in-law, I should say, has a home valued at $350,000 that is free and clear and he is willing to co-sign.

Grandma has two cars. She doesn't know the makes and models, but I think that both of those homes might be enough from what the co-Defendant also had a secured by property bond at $300,000 with a --

THE COURT: All right. So between the mom's home at $125,000 and the father-in-law's $350,000 free and clear -- sir, are you willing to co-sign?

MR. ASHLEY: Yes.

THE COURT: All right. Any additional proffer?

MS. MACRI: No, sir.

THE COURT: All right. Any additional argument from the Government?

MR. CHASE: Yes, Judge.

Judge, you have 29 crimes in 22 days. You have 58 years potential felony penalty for the aggravated identity theft, plus the 29 counts of the 30-year bank fraud.

You have a search warrant that was obtained on May 16th of 2018 that shows text messages, photographs of stolen driver's licenses.

You have the overturned vehicle from which was this Defendant ran. He was eventually arrested, but prior to running, they destroyed the evidence, the stolen checks.

Then, when he is arrested, he gives two false names. Only when this particular agent ran a fingerprint comparison did the real name come to light. He also has two arrests and convictions for false names to law enforcement besides the one in Detroit.

(Phone ringing.)

THE COURT: That's two days in a row, Mr. Lanigan.

MR. CHASE: You have a conviction for failure to appear. You have three violations of probation. The conditions on probation are pretty much identical to the conditions on bond.

And one of those violations of probation, at least according to the Pretrial Services Report, resulted in

conviction because there is an amended sentence.

Information we have is he failed to appear in court in Detroit to respond to the Chesterfield PD case. The public defender is saying that someone did appear, but as someone, whether it was this Defendant or his brother, if it was the Defendant, he continued the charade, the misidentification. He lied in court, Judge, repeatedly to judges in Detroit.

When the name was called of Jerrod Watson, this Defendant shows up and we're supposed to give him a gold star because he appeared, but he committed a crime by lying to the Court every single time he said he was Jerome Watson, or it was Jerrod Watson who was in cahoots with his brother to continue the charade, but he is supposed to be worthy of a bond?

I don't think so, Judge. We would ask that you detain him and send him to Detroit in order for him to face the charges.

THE COURT: All right. Any additional argument, Miss Macri?

MS. MACRI: Judge, the only argument is that had Robert Polina, Mr. Watson's manager been here, he could have attested to the fact that he had flown back and forth to Michigan at least five or six times.

THE COURT: All right. Let me thank both parties for making a strong presentation on behalf of your respective clients.

To begin with, based on the structure of the statute, I don't believe that the statute supports economic danger to the community. This is not one of the crimes that is listed as a normal crime that is appropriate for pretrial detention.

And there is certainly no presumption, but it is also not one of the listed crimes for appropriate request for pretrial detention.

What that means is, under the other section that applies, the Defendant can be detained if there is a serious risk that he will flee, or if there is a serious risk that the person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate a perspective witness or juror.

Again, that doesn't include economic danger to the community. I do not find that there is any serious risk that he will obstruct justice.

The question then becomes whether the prosecutor has presented enough evidence to convince me that there is a serious risk that he will flee and the Government has certainly presented some evidence of that.

I am particularly concerned about one of the things that have been highlighted by Mr. Chase. The fact that he ran at the time that he was being pursued back in 2015. The fact that he destroyed evidence and gave false names on multiple occasions. And even if he did appear, he's appearing under a

false name.

Also, I am concerned about the fact that it seems to me unlikely that word didn't get back to him in November of this past year that he was wanted on this charge and he never presented himself.

Also, he is facing significant time, but the fact that it is 29 crimes in 22 days, or whatever, the check cashing, there is also the stealing of purses with the total amount of fraud in something in the neighborhood of $44,000, which is not that much for around here.

While he is facing 58 years, if he is convicted on all aggravated identity thefts and the Judge ran them all consecutive that's not normal practice here. I doubt if that's the normal practice in Detroit that they can run concurrent with each other.

And if he wanted to resolve this case, even though he has a significant criminal history, he could do it for something in the range of 27 to 33 months, plus an aggravated identity theft if that was the deal. That's still significant time, but it is not the death sentence that the prosecutor is suggesting that it might be.

So that leaves us with the question of whether there is a serious risk of flight. I am going to discount his older convictions, his juvenile convictions. Although they are very serious, they are a long time ago.

The primary thing in his favor is that I am going to accept the proffer that he appeared in those other cases. I don't show that there is a charge of failure to appear.

And even though, you are right, Mr. Chase, he was appearing under another name, he was perpetrating a fraud on the Court. However, he did appear. And I am primarily, also in his favor, going to focus on the last four years and the fact that he has people here in court for him.

He's got a fiancee who has a good job. He has a grandmother and in-laws, and mother who appeared in support. They have property to support him. He's got a good job to go back to and he would be very foolish to throw that all away and not appear in Detroit. That doesn't mean that he is not going to throw it all away and not appear in Detroit.

He might, but I am going to take a chance on him and set a bond. He certainly provided enough evidence that I could detain him, Mr. Chase, but I am going to take a chance on you Mr. Watson, and set a bond similar to the one that the co-Defendant had. It will be a $300,000 personal surety bond. I want it co-signed by his father-in-law.

What is your name, sir?

MR. ASHLEY: Willie Ashley.

MS. MACRI: Willie Ashley.

THE COURT: And also by his mom that's secured by -- pardon me?

MS. MACRI: Clara Watson.

THE COURT: Clara Watson.

Mr. Ashley, it is a significant obligation that you have been asked to do. If he does not appear in court when he is supposed to, not only could he be charged with bond jumping, which might be more serious than what he is already charged with, but also the Government could go against you for the full amount of the bond, $300,000.

Do you understand that?

MR. ASHLEY: Yes, sir.

THE COURT: Are you willing to take on that obligation?

MR. ASHLEY: Yes, sir.

THE COURT: And Mr. Watson, the same would go for your mother. I am going to give her 24 hours to get in here.

Oh, you're here. Okay.

MS. MACRI: Yeah, she made it.

THE COURT: Miss Watson, do you understand that, too, if he doesn't appear in court, or violates a bond in any other significant respect, not only would it go very badly for him in his existing case, but also charged with bond jumping, but the Government could sue you for the full amount of the bond?

MS. WATSON: Yes.

THE COURT: And you are both willing to take on that obligation?

MS. WATSON: Yes.

THE COURT: All right. Mr. Watson, if you don't appear, you are putting your mom and your father-in-law on the street.

Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: All right. I am going to set the bond at $300,000 personal surety bond co-signed by both of them. Well, let me finish up with the bond.

First and most important, condition of bond is that you appear when and where you are supposed to appear. Stay in touch with Miss Macri and she will let you know when you need to appear in Detroit.

You have to also not commit any other crimes while on you are on bond. Again, I am primarily relying on the fact that you have not committed any new crimes in the last four years. You've got a bad past, but at some point you could redeem that. Don't mess it up.

THE DEFENDANT: Yes.

THE COURT: If you have any travel documents, passport or anything like that, you need to surrender those.

Do you have a passport?

THE DEFENDANT: No.

THE COURT: You are not to try to obtain any passports or travel documents while you are on bond.

You need to report to Pretrial Services as directed. I will leave it up to them to tell you when, where, how often, and in what manner.

I am going to require random urine testing because of past drug use. You are not allowed to use any illegal drugs, including marijuana, while you are on bond.

You are to maintain or seek full-time employment.

You are not to have any contact with any victims or witnesses except through your lawyer.

No firearms because you are a convicted felon.

Travel is restricted to the Southern District of Florida.

And do you know what district --

MS. MACRI: Eastern District.

THE COURT: Eastern District of Michigan.

And if you going by car or train, you can travel through the states that are in between. But, otherwise, you are restricted to the Southern District of Florida that goes from Key West to Vero Beach and to the Eastern District of Michigan.

Any additional restrictions you would like, Mr. Chase?

MR. CHASE: Just a moment, Judge.

He is not to be in possession of anybody's, other than his own, personal identification.

THE COURT: That's reasonable given the nature of the

crime.

You are not to be in any possession of any personal identifiable information. That includes credit cards, Social Security numbers, dates of birth, et cetera, of other individuals.

MR. CHASE: Home confinement, electronic monitoring.

MS. MACRI: Judge, the co-Defendant was not home confined. He has a job and he has several kids that he takes care of. He has an active life. This was something that happened four years ago.

I understand what he is facing and the time is serious, but in fairness, the co-Defendant got what you already ordered.

MR. CHASE: I'm pretty sure the co-Defendant didn't have two arrests with false names and convictions.

I am sure that he didn't give the Chesterfield Police Department two false names upon arrest.

I'm sure he didn't do a charade in front of the Chesterfield court system that he was, in fact, Jerome Watson when he wasn't.

THE COURT: I don't think it's an unreasonable request and I will reconsider it at a later time if he shows that he is compliant of all conditions, but I am going to require electronic monitoring and a curfew.

He could leave for work and for other needs such as

medical needs, court appearances, attorney visits, religious, and employment.

MS. MACRI: He also goes to school, Judge, on Tuesdays and Thursdays.

THE COURT: And he would be allowed to leave for school and anything else that is approved by Pretrial.

They will be give permission in advance to give permission for any of those, including legal visits and for his school.

MS. MACRI: Would you allow him to also coach his son's football team?

THE COURT: If it is a fixed time and a fixed -- is it like every Saturday or something like that?

THE DEFENDANT: Weekdays we practice and Saturdays, yes, we have games.

THE COURT: I will allow that as well.

So why don't you talk to Mr. Chase and tell me what a reasonable curfew is and I will impose that curfew with electronic monitoring.

PROBATION: Your Honor, it either has to be home detention where he is only allowed allowances for court visits or medical visits, or a curfew. It can't be both.

THE COURT: Okay. It will be a curfew, then.

PROBATION: Your Honor, do you want the GPS monitoring for the curfew?

THE COURT: What is the comparative cost?

PROBATION: It would be $3.40 a day.

THE COURT: For either one?

PROBATION: And it will be either paid by us or the Defendant.

THE COURT: They are the same cost, electronic monitoring with a phone and GPS?

PROBATION: Yes, Your Honor. It will be paid for by us.

THE COURT: Which is easier for you to administer?

PROBATION: The GPS.

THE COURT: All right. Then I will order GPS monitoring with a curfew.

Have you been able to discuss a time that is an agreeable curfew time?

MS. MACRI: Judge, can you give me one more second?

THE COURT: Yes.

MS. MACRI: Judge, it's going to be 10:00 p.m. to 6:00 a.m.

THE COURT: All right. He will be on a curfew from 10:00 p.m. to 6:00 a.m. You will be monitored by GPS. It will be paid for by Probation.

So you have to be home between 10:00 p.m. and 6:00 a.m. Other than that, you can do the things that we just discussed.

MS. MACRI: Judge, if he is going to be traveling by airplane, he is not going to be able to get on the plane with the GPS device, I'm assuming.

THE COURT: They must make accommodations for that. People travel all the time, don't they Probation?

PROBATION: Yes, Your Honor.

PRETRIAL SERVICES: Yes, they do, Your Honor.

THE COURT: So if it becomes a problem bring it back to the Court, but I don't think there is a problem. You have to show them what it is and get checked for it and all that.

So any additional conditions, Mr. Chase?

MR. CHASE: No, sir.

THE COURT: Any other conditions you would like, Miss Macri?

MS. MACRI: No, sir. Thank you.

THE COURT: All right. That will take care of the bond and we will give you the bond paperwork and both you and the co-signers will have to sign.

I believe during the course of the agent's testimony and during the proffer, you have established identity through discussion of fingerprints and photographs, et cetera, Mr. Chase.

Miss Macri, do you have any objection to -- well, first of all, is he willing to waive removal or do you have an objection to me making a finding of identity and probable

cause?

MS. MACRI: We will waive at this point, Your Honor.

THE COURT: All right. Let me give you a waiver then.

MR. CHASE: Judge, regarding bond, we are trying to contact the prosecutor assigned to the case in Detroit. Can we have 24 hours to see if he wants to appeal?

THE COURT: Yes. I will stay the bond for 24 hours.

Please, if you find out an answer today and it is no, please let Miss Macri and the Marshal know right away, but if you want to appeal -- Mr. Watson, this is essentially a Detroit case and not a South Florida case.

If the prosecutor up there wants to appeal it, the prosecutor has a right to appeal it to a District Judge up there. And it is my normal practice that if the prosecutor wants to appeal a denial of the detention to allow that and to hold you in custody until that happens. So Mr. Chase is requesting 24 hours.

So he is possibly going to be held in custody overnight. It is possible that you will be held in custody if the prosecutor up there wants to appeal, it's possible you will be held in custody going up to Detroit, but my order is going to be that you be released. And I'm asking the prosecutor to contact -- well, I guess contact Miss Macri in Troy and Troy will take care of the Marshals, right?

THE COURTROOM DEPUTY: Yes.

THE COURT: So we will be relying on you.

PRETRIAL SERVICES: Your Honor, I just want to clarify, it is GPS with a curfew. The allowances only apply to those that are on home detention.

THE COURT: Okay. Forget the allowances. If it is just a curfew, then --

PRETRIAL SERVICES: GPS and curfew.

THE COURT: Yes. Although for medical needs if you need to leave for medical emergency go, but contact Pretrial Services and let them know about it. Other than that, everything should be covered by the curfew.

Does that cover everything, Pretrial?

PRETRIAL SERVICES: Correct, Your Honor.

THE COURT: Mr. Chase, you have 24 hours to decide whether to appeal, but if you have an answer quickly, please let us know --

MR. CHASE: Yes, sir.

THE COURT: -- so he doesn't stay in jail.

Anything else from you, Miss Macri?

MS. MACRI: No, sir. Thank you.

THE COURT: You've got to sign the waiver and hand that up.

THE COURTROOM DEPUTY: Sign the waiver. He has to sign here. Family members have to sign here.

THE COURT: Hold on a second. Miss Macri, can you

take care of the waiver because we are going to take a short break after that.

MS. MACRI: I'm sorry.

THE COURT: We have to get the waiver before I give the order of removal. So the case is still open until you do that.

MS. MACRI: Yes, sir.

THE COURT: All right. Mr. Watson, you have been handed a document entitled waiver of removal hearing. It appears to have your signature on it.

Is that your signature?

THE DEFENDANT: Yes, sir.

THE COURT: Did you read it and understand it, or have it explained to you before you signed it?

THE DEFENDANT: Yes, sir.

THE COURT: And you understand by waiving your removal hearing, you are not admitting guilt. You are simply agreeing that the Government could get as far as probable cause and identity and that I would order you to go to Michigan?

THE DEFENDANT: Yes, sir.

THE COURT: And is that what you want to do is waive that right?

THE DEFENDANT: Yes.

THE COURT: All right. I am going to find a knowing, voluntary, and intelligent waiver of removal hearing, but as a

backup, I also find that the probable cause and identity have been established at the hearing.

I am going to order your removal. I am not going to enter that order until we find out whether you are going to be on bond, but it will be signed and you will be ordered removed today.

If you are in custody, the Marshals will get you to Michigan as quickly as possible. Otherwise, stay in touch with Miss Macri. She will let you know when and where to appear.

Anything else to come before the Court on this case, Mr. Chase?

MR. CHASE: No, Your Honor.

THE COURT: Miss Macri?

MS. MACRI: No, sir.

THE COURT: All right. Good luck to you, Mr. Watson.

All right. We will take a brief recess and then start the duty calendar.

(Thereupon, the proceedings concluded.)

CERTIFICATE

I hereby certify that the foregoing transcript is an accurate transcript of the audio recorded proceedings in the above-entitled matter.

04/04/19

Bonnie Joy Lewis,
Registered Professional Reporter
CASE LAW REPORTING, INC.
7001 Southwest 13 Street,
Pembroke Pines, Florida 33023
954-985-8875